Filed 2/21/23 In re J.B. CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re J.B., a Person Coming Under the Juvenile Court Law. | B320089 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>N.I.,<br><br>Defendant and Appellant. | Los Angeles County Super. Ct. No. CK64456C |

APPEAL from an order of the Superior Court of Los Angeles County. Donald A. Buddle, Judge. Affirmed.

Megan Turkat Schirn, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Jessica S. Mitchell, Senior Deputy County Counsel, for Plaintiff and Respondent.

\* \* \* \* \* \* \* \* \* \*

Mother N.I. appeals the juvenile court's order terminating her parental rights to her son J.B.  J.B.'s father, R.B., is not a party to this appeal.  Mother's sole contention on appeal is that the trial court erred in finding the Indian Child Welfare Act (ICWA; 25 U.S.C. § 1901 et seq.) did not apply because the Los Angeles County Department of Children and Family Services (Department) made an inadequate initial inquiry concerning J.B.'s relevant ancestry by failing to contact and interview mother's extended family members.  We affirm.

## BACKGROUND

### 1.    Overview of Proceedings

This dependency proceeding began in August 2017, more than five years ago, when J.B. was four years old.  At the time of the petition, J.B.'s father had legal and physical custody of him pursuant to a 2016 family law order.  Mother's contact with J.B. and his father was restricted by a restraining order stemming from a domestic violence incident in which she was the aggressor.  In violation of that order, mother resided with father and J.B.

This living arrangement resulted in another violent altercation between the parents.  J.B. was present.  Mother called police after father assaulted her and a referral was made to the Department.  J.B. was placed with his paternal grandfather and paternal stepgrandmother pursuant to a safety plan pending investigation.

Shortly thereafter, the Department filed a detention petition and J.B. was ordered detained.  He remained with his paternal grandfather and paternal stepgrandmother pursuant to this order.  The petition was sustained without contest under Welfare and Institutions Code section 300, subdivision (b)(1) and (b)(2), and J.B. was ordered removed from the parents.  J.B.

remained in the home of his paternal grandfather and paternal stepgrandmother pursuant to this order. The court ordered services for both parents.

The parents failed to reunify with J.B. (mother had two separate periods of incarceration during the reunification period) and the court terminated reunification services in August 2019. Paternal grandfather and paternal stepgrandmother expressed willingness to adopt J.B. The juvenile court ordered such adoption as his permanent plan in December 2021 over mother's objection. In April 2022, the court ordered the parental rights of mother and father terminated and directed the Department to implement J.B.'s adoption.

Mother timely appealed termination of her parental rights.

## 2. Facts Relevant to ICWA Inquiry

As this appeal rests entirely on the Department's failure to "contact and interview mother's extended family members about ICWA," we recite in detail the facts relevant to the Department's ICWA inquiry.

The Department attached an ICWA-010(A) form to the petition indicating it had made Indian child inquiries with J.B.'s father and J.B. had no known Indian ancestry.

Mother and father each filed a signed ICWA-020 form in connection with their initial appearances in August 2017. Each indicated "no Indian ancestry as far as [they] know." Based on these forms, the court found no reason to believe J.B. had Indian ancestry on either side of his family. The court further admonished the parents "to keep the Department, their Attorney[s] and the Court aware of any new information relating to possible ICWA status."

3

The Department spoke with "Paternal Grandmother" in November 2019 and she stated father had no Indian heritage. We understand this as a reference to paternal *step*grandmother because paternal grandmother died sometime before 2017. The Department reported paternal stepgrandmother's statement to the juvenile court. In December 2020, the Department spoke with "Ms. B"—a name the Department has used to identify paternal stepgrandmother—who stated "the family does not have any Native American Heritage." The Department reported this to the court as well.

At a hearing in December 2020, the juvenile court inquired again with father about Indian heritage. Father equivocated, explaining, "I really don't know. My family doesn't tell me about everything." But, based on what he did know and had "tried to figure out [him]self," he confirmed he did not believe he had any Indian ancestry. Based on this and the signed ICWA-20 forms, the juvenile court found "no reason to know that [J.B.] is an Indian child."

Aside from paternal stepgrandmother (who mother also refers to as paternal grandmother), mother does not identify direct contact between the Department and any other of J.B.'s extended family members. Mother notes father was raised by paternal great-grandmother, paternal grandfather, and now-deceased paternal grandmother. The reports refer to contact with paternal great-grandmother, who was identified as a visitation monitor, and with paternal grandfather, with whom J.B. was placed. We are directed to nothing in the record indicating the Department inquired with these paternal family members about Indian ancestry, but mother claims no error in this regard.

As to her own extended family members, mother notes the absence of any record that the Department contacted or attempted to contact them. Mother told the Department she was raised by maternal grandmother until she was 17, excepting a one-year stint in foster care when she was 12. When mother was 17, maternal grandmother murdered mother's five-year-old brother and remains incarcerated for his killing. At age 18, mother developed a relationship with maternal grandfather for the first time. She has two older brothers and an older sister. Mother has a relationship with maternal aunt and one of the maternal uncles. There is no indication in the record the Department requested or received contact information for mother's extended family members.

Finally, both parties note mother was involved in prior dependency proceedings involving two older children by another father. Mother observes these prior proceedings took place before the current law expanding the duty of initial inquiry to include reference to extended family members.

## DISCUSSION

Congress enacted ICWA " 'to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families.' " (*In re Isaiah W.* (2016) 1 Cal.5th 1, 8.) It is incumbent upon a state court administering a proceeding where child custody is at issue to inquire whether the subject child is an Indian child. The scope of the duty on the court, as well as certain participants in the proceeding, is defined by federal regulations and related state law. (See, e.g., 25 C.F.R. § 23.107 (2022); Welf. & Inst. Code, § 224.2; Cal. Rules of Court, rule 5.481.)

The duty of inquiry has three "phases." Mother claims error with the first. This phase—the "initial inquiry"—applies in every case. The initial inquiry requires the court and the Department to ask certain persons related to the proceedings about the child's possible Indian ancestry. (See Welf. & Inst. Code, § 224.2, subds. (a), (b), (c); *In re S.S.* (2022) 75 Cal.App.5th 575, 581; *In re D.F.* (2020) 55 Cal.App.5th 558, 566.) The state law initial inquiry requirements exceed those imposed by federal law, which merely require the court to "ask each participant in an emergency or voluntary or involuntary child-custody proceeding whether the participant knows or has reason to know that the child is an Indian child" and instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child. (25 C.F.R. § 23.107(a) (2022).)

Where the "initial inquiry" gives "reason to believe" the child is an Indian child, but there is insufficient information to make a definitive determination, the second phase—"further inquiry"—comes into play. (Welf. & Inst. Code, § 224.2, subd. (e)(2).) Further inquiry requires more robust investigation into possible Indian ancestry. (See *ibid*.; *In re D.F.*, *supra*, 55 Cal.App.5th at p. 566.)

If further inquiry gives the court a "reason to know" a child is an Indian child, the third phase is triggered. This phase requires notice pursuant to ICWA be sent to the tribes to facilitate their participation in the proceedings. (Welf. & Inst. Code, § 224.3, subd. (a)(1); *In re D.F.*, *supra*, 55 Cal.App.5th at p. 568.)

A juvenile court's finding that ICWA does not apply in a proceeding implies (a) neither the Department nor the court had

6

a reason to know or believe the subject child is an Indian child; and (b) the Department fulfilled its duty of inquiry. (*In re Josiah T.* (2021) 71 Cal.App.5th 388, 401.)

" ' "[W]e review the juvenile court's ICWA findings under the substantial evidence test, which requires us to determine if reasonable, credible evidence of solid value supports the court's order. [Citations.] We must uphold the court's orders and findings if any substantial evidence, contradicted or uncontradicted, supports them, and we resolve all conflicts in favor of affirmance." ' " (*In re Josiah T.*, *supra*, 71 Cal.App.5th at p. 401.)

Mother's claim of error is that the juvenile court found the ICWA inapplicable without evidence the Department contacted, or attempted to contact, mother's extended family members to inquire about Indian ancestry. The Department concedes it failed in its initial inquiry obligation imposed by California law to ask "extended family members" whether J.B. is, or may be, an Indian child, rendering the trial court's finding erroneous. (Welf. & Inst. Code, § 224.2, subd. (b).)

Although Welfare and Institutions Code section 224.2, subdivision (b), requires the Department to inquire with extended family members about Indian heritage as part of its initial inquiry, no court has read it as requiring inquiry with *all* extended family members, no matter how challenging it may be to reach them. (Cf. *In re Q.M.* (2022) 79 Cal.App.5th 1068, 1082 ["requiring DCFS to run down unpromising leads comes at a significant cost in terms of protecting the welfare of dependent children"].)

Mother's opening brief cites a number of cases in support of her contention that "the duty of initial inquiry was not completed

absent contact, or documented attempts to contact mother's extended family members." But her leading cases on the topic address the point in the context of *further* inquiry. (See *In re D.S.* (2020) 46 Cal.App.5th 1041, 1053–1054 ["As part of its duty to inquire about a child's Indian ancestry pursuant to section 224.2, subdivision (e)(1) [i.e., the duty of further inquiry], the Agency must interview extended family members"; duty satisfied by speaking to single aunt]; *In re D.F., supra,* 55 Cal.App.5th at p. 569 [addressing only adequacy of further inquiry]; *In re T.G.* (2020) 58 Cal.App.5th 275, 290 [discussing obligation to interview extended family members only in context of further inquiry].) Indeed, mother's authorities could be read as limiting the extended family member initial inquiry duty to inquiring only with those *actually involved* in the proceedings. (See *In re D.F.*, at p. 568 [initial inquiry duty is "to ask all relevant *involved* persons whether the child may be an Indian child" (italics added)]; *In re T.G.*, at p. 290 [initial inquiry duty is "to ask all relevant *involved* individuals whether the child may be an Indian child" (italics added)].) As far as we can glean from the record, in the five years they were pending, none of the persons mother claims the Department should have contacted had any involvement in the proceedings below. Maternal grandmother was incarcerated and there is no indication mother's siblings or maternal grandfather were readily accessible to the Department (access that may have been further complicated by mother's multiple stints in state custody during the case).

Under the circumstances, however, we need not resolve whether error occurred. The only claimed error is one of state law and therefore reversible only if shown to be prejudicial. (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 742 (*Benjamin M.*),

citing Cal. Const., art. VI, § 13.)  We are satisfied any error that occurred here was not.

Courts are divided on what showing of prejudice warrants reversal for initial inquiry errors.  "Some courts have addressed this problem by requiring an appellant who asserts a breach of the duty of inquiry to, at a minimum, make an offer of proof or other affirmative assertion of Indian heritage on appeal."  (*In re S.S., supra,* 75 Cal.App.5th at pp. 581–582, citing cases.)  Others have excused such a showing, effectively treating failure to inquire as error per se.  (See, e.g., *In re Y.W.* (2021) 70 Cal.App.5th 542, 556; *In re J.C.* (2022) 77 Cal.App.5th 70, 80.)  The Fourth Appellate District in *Benjamin M., supra,* 70 Cal.App.5th 735, took a third approach, concluding "a court must reverse where the record demonstrates that the agency has not only failed in its duty of initial inquiry, but where the record indicates that there was readily obtainable information that was likely to bear meaningfully upon whether the child is an Indian child."  (*Id*. at p. 744.)  Our court took a fourth approach, concluding initial inquiry errors require reversal only when the record of proceedings in the court or a proffer of evidence made on appeal suggests a reason to believe the child may be an Indian child.  (*In re Dezi C.* (2022) 79 Cal.App.5th 769, 779, review granted Sept. 21, 2022, S275578.)

We have previously rejected the error per se line of cases. (*In re M.M.* (2022) 81 Cal.App.5th 61, 71, review granted Oct. 12, 2022, S276099.)  Under any of the other three lines of cases, the court's error here was harmless.

On the record before us, there is no reason to believe there is readily obtainable information likely to bear meaningfully on whether J.B. has Indian ancestry.  Mother and father both

9

denied knowledge of any Indian ancestry in signed, written submissions to the juvenile court. Father reiterated his lack of knowledge of Indian ancestry in person on the record. And neither parent provided additional information to the court about Indian ancestry in the five years since being admonished to do so. As such, this case is unlike *Benjamin M.* There, the father was entirely absent from the proceedings and no person from the father's side of the family had been asked about Indian ancestry. With information about ancestry on the father's side completely "missing," inquiry with a person sharing the father's ancestry "would likely have shed meaningful light on whether there [wa]s reason to believe Benjamin [wa]s an Indian child." (*Benjamin M.*, *supra*, 70 Cal.App.5th at p. 744.) No such facts are present here.

Moreover, the record does not reflect the information mother claims the Department should have sought was "readily obtainable." Mother contends the Department should have contacted each living person mother mentioned in relaying her family history to the Department—her three older siblings, maternal grandfather, and maternal grandmother. Maternal grandmother is incarcerated. Mother is not in contact with an older brother. While she is in contact with maternal grandfather and her other two older siblings, there is no indication those individuals were willing to talk to the Department at all. Despite their relation to J.B., none appeared or was volunteered by mother as a potential participant in the proceedings.

Further, we are offered no reason in the record to believe mother's extended family members would have better information about her ancestry than she did. Citing to *In re Y.W.*, *supra*, 70 Cal.App.5th 542, mother argues her knowledge of her own ancestry "may not be reliable as she was raised in foster

10

care and estranged from her parents." This overstates the degree of detachment from her family. Mother was in foster care for one year in her early teens. Otherwise, until she was 17, she was raised by maternal grandmother. After that, when she was 18, she developed a relationship with maternal grandfather. Accordingly, this case is nothing like *In re Y.W.*, in which the mother was adopted and did not have information about her biological relatives at all, much less any contact with them. (*Id.* at p. 548.)

Mother's contact with maternal grandfather and two older siblings is significant in the abstract to show a likelihood of shared knowledge of ancestry. (See, e.g., *In re Ezequiel G.* (2022) 81 Cal.App.5th 984, 1015 ["All of the parents appear to have been in contact with their extended families, and thus the possibility that they might unknowingly be members of a tribe appears trivially small."].) But it takes on heightened significance in the context of a repeat participant in dependency proceedings. Although we agree with mother that dependency proceedings occurring prior to the relevant amendments to Welfare and Institutions Code section 224.2 are not direct evidence of what a family member might have said about Indian ancestry, such ancestry was still at issue in mother's prior proceedings with the Department. Given the repeated significance of the issue to her parental rights, we expect she would have asked her relatives with whom she had contact about Indian heritage. But after two Department cases, mother still "ha[s] no Indian ancestry as far as [she] know[s]."

Finally, no one has suggested any reason to believe J.B. might have Indian ancestry. Certainly, mother has made no offer of proof that he is an Indian child.

Given the absence of any evidence or claim J.B. might have Indian ancestry, mother's "unvarnished contention that additional interviews of [her relatives] would have meaningfully elucidated [his] Indian ancestry" does not support a finding of prejudice. (*In re Darian R.* (2022) 75 Cal.App.5th 502, 510.)

**DISPOSITION**

The juvenile court's order terminating mother's parental rights is affirmed.

GRIMES, Acting P. J.

I CONCUR:

HARUTUNIAN, J.*

---

* Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**WILEY, J., Dissenting.**

It would not have been hard for the Department to try to contact the maternal grandfather. The Department was in regular contact with J.B.'s mother and knew she had phoned that grandfather recently. The Department just never made the effort.

The Department should have made the effort. When it would be so easy to comply with the statute, it is more than an affront to tribes for whom the Legislature amended the statute in 2018. For tribes, it is a miscarriage of justice. The Department's disinterest in their fate shuts them out of a process that could allow them to learn of children to carry tribal culture into the future.

This is my 18th dissent on this issue. I remain hopeful the Department one day will conclude a wise course would be to comply with the law.


WILEY, J.